18-3512

_____

**UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

_____

JON LUER and ANDREA STEINEBACH,
Plaintiffs/Appellees,

v.

ST. LOUIS COUNTY, MISSOURI, Defendant,

MICHAEL CLINTON, and BENJAMIN SELZ, Defendants/Appellants.

_____

Appeal from the United States District Court
Eastern District of Missouri, Eastern Division
Case Number 4:17-cv-767
The Honorable Nannette A. Baker, District Judge

_____

**APPELLEES' BRIEF**

_____

Anthony E. Rothert
Jessie Steffan
Omri E. Praiss
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
(314) 652-3114

Gillian R. Wilcox
ACLU of Missouri Foundation
406 West 34th Street
Suite 420
Kansas City, Missouri 64111
(816) 470-9933

**Attorneys for Appellees**

1

# **TABLE OF CONTENTS**

SUMMARY OF THE CASE ..................................................................................3

JURISDICTIONAL STATEMENT ......................................................................8

STATEMENT OF THE ISSUES..........................................................................9

STATEMENT OF THE CASE ............................................................................11

STANDARD OF REVIEW .................................................................................19

SUMMARY OF THE ARGUMENT ...................................................................20

ARGUMENT ......................................................................................................23

    *I.    The officers violated Appellees' Fourth Amendment rights when they entered and searched the curtilage of their home without a warrant and absent exigent circumstances, and characterizing those searches as a "protective sweep" does not cure their unconstitutionality. ..................................................23*

    *II.   The officers violated Appellees' Fourth Amendment rights when they entered and searched the interior of their home without a warrant and absent exigent circumstances.................................................................................32*

    *III. Appellees' right to be free from unreasonable government intrusions into the curtilage and interior of their home under the circumstances was clearly established at the time and the officers are therefore not entitled to qualified immunity...............................................................................................42*

CONCLUSION ...................................................................................................51

# TABLE OF AUTHORITIES

*Cases*

*Brigham City v. Stuart*,
 547 U.S. 398 (2006)................................................................ 26, 39, 40

*Burke v. Sullivan*,
 677 F.3d 367 (8th Cir. 2012) ............................................................ 42

*Burnikel v. Fong*,
 886 F.3d 706 (8th Cir. 2018) ......................................................*passim*

*Carroll v. Carman*,
 135 S. Ct. 348 (2014).......................................................................... 40

*Collins v. Virginia*,
 138 S. Ct. 1663 (2018).................................................................*passim*

*Coolidge v. New Hampshire*,
 403 U.S. 443 (1971)............................................................................ 25

*Florida v. Jardines*,
 569 U.S. 1 (2013).........................................................................*passim*

*Georgia v. Randolph*,
 547 U.S. 103 (2006)............................................................................ 41

*Guite v. Wright*,
 147 F.3d 747 (8th Cir. 1998) ............................................................ 44

*Herts v. Smith*,
 345 F.3d 581 (8th Cir. 2003) ............................................................ 19

*Hope v. Pelzer*,
 536 U.S. 730 (2002)............................................................................ 45

*Illinois v. McArthur*,
 531 U.S. 326 (2001)............................................................................ 41

*Maryland v. Buie*,
 494 U.S. 325 (1990).............................................................. 28, 31, 48

*Mincey v. Arizona*,
  437 U.S. 385 (1978)..................................................................................... 25

*Mitchell v. Shearrer*,
  4:10CV819, 2012 WL 943322 (E.D. Mo. March 20, 2012) ............................... 22

*Norfleet v. Ark. Dep't of Human Servs.*,
  989 F.2d 289 (8th Cir. 1993) ......................................................................... 46

*Ohio v. Robinette*,
  519 U.S. 33 (1996)........................................................................................ 24

*Oliver v. United States*,
  466 U.S. 170 (1984) ................................................................................. 23, 24

*Patzner v. Burkett*,
  779 F.2d 1363 (8th Cir. 1985) ...............................................................*passim*

*Payton v. New York*,
  445 U.S. 573 (1980)...............................................................................*passim*

*Pearson v. Callahan*,
  555 U.S. 223 (2009)...................................................................................... 45

*Rogers v. Carter*,
  133 F.3d 1114 (8th Cir. 1998) ................................................................*passim*

*Saucier v. Katz*,
  533 U.S. 194 (2001)...................................................................................... 45

*Sherbrooke v. City of Pelican Rapids*,
  513 F.3d 809 (8th Cir. 2008) ........................................................................... 8

*Smith v. Kansas City Police Dep't*,
  586 F.3d 576 (8th Cir. 2009) .................................................................*passim*

*Stanton v. Simms*,
  571 U.S. 3 (2013).......................................................................................... 40

*Steagald v. United States*,
  451 U.S. 204 (1981)...................................................................................... 37

*Tlamka v. Serrell*,
  244 F.3d 628 (8th Cir. 2001) ................................................................. 45

*Tolan v. Cotton*,
  572 U.S. 650 (2014) ................................................................. 9, 19, 45

*United States v. Anderson*,
  688 F.3d 339 (8th Cir. 2012) ................................................................. 26

*United States v. Ball*,
  90 F.3d 260 (8th Cir. 1996) ................................................................. 25

*United States v. Carter*,
  360 F.3d 1235 (10th Cir. 2004) ................................................................. 30

*United States v. Conner*,
  127 F.3d 663 (8th Cir. 1997) and 948 F. Supp. 821 (N.D. Iowa 1996) ... 27, 38, 51

*United States v. Delgado-Perez*,
  867 F.3d 244 (1st Cir. 2017) ................................................................. 30

*United States v. Duchi*,
  906 F.2d 1278 (8th Cir. 1990) ................................................................. 48

*United States v. Greer*,
  607 F.3d 559 (8th Cir. 2010) ................................................................. *passim*

*United States v. Harris*,
  747 F.3d 1013 (8th Cir. 2014) ................................................................. 24

*United States v. James*,
  353 F.3d 606 (8th Cir. 2003) ................................................................. 25, 31

*United States v. Ramirez*,
  676 F.3d 755 (8th Cir. 2012) ................................................................. 26

*United States v. Sanders*,
  424 F.3d 768 (8th Cir. 2005) ................................................................. 25

*United States v. Selberg*,
  630 F.2d 1292 (8th Cir. 1980) ................................................................. *passim*

*United States v. Spotted Elk*,
  548 F.3d 641 (8th Cir. 2008) ............................................................. 50

*United States v. Tisdale*,
  921 F.2d 1095 (10th Cir. 1990) .................................................... 29, 47

*United States v. Waldner*,
  425 F.3d 514 (8th Cir. 2005) ....................................................... *passim*

*United States v. Wells*,
  648 F.3d 671 (8th Cir. 2011) .................................................... 9, 36, 37

*United States v. Williams*,
  521 F.3d 902 (8th Cir. 2008) ............................................... 9, 25, 27, 48

*Wallace v. City of Alexander*,
  843 F.3d 763 (8th Cir. 2016) ............................................................. 19

*Warden v. Hayden*,
  387 U.S. 294 (1967)......................................................................... 40

*Welsh v. Wisconsin*,
  466 U.S. 740 (1984)................................................................... *passim*

**Statutes**

28 U.S.C. § 1331 ............................................................................... 8

42 U.S.C. § 1983 ............................................................................... 8

Mo. Rev. Stat. § 570.030 .................................................................. 34

## SUMMARY OF THE CASE

On July 10, 2016, at approximately 3 a.m., Officers Clinton and Selz were dispatched to a subdivision to investigate a customer's failure to pay a cab fare. The cab driver reported that the customer had gone in the "general direction" of two nearby houses and had disappeared between them. App. 1191. One of those houses was the Luer-Steinebach home.

Despite the fact that they did not have a warrant or consent, the officers proceeded to search both the curtilage and the interior of the Luer-Steinebach home. First, while conducting what he now calls a "protective sweep," Officer Clinton entered a neighboring yard and circled that house. Next, as he headed back up toward the street, he encountered the garden pathway immediately adjacent to the Luer-Steinebach home. While there, Clinton saw a side door leading into their attached garage that was ajar. Clinton called Selz, and they circled the Luer-Steinebach house, which remained dark and quiet the entire time. Then the officers drew their weapons and proceeded through the garage and into the main living quarters of the house, where they encountered a shocked Luer, who had been asleep in bed with his spouse.

The officers appeal the district court's rejection of their qualified-immunity defense to Appellees' Fourth Amendment claim.

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1331, the district court had subject-matter jurisdiction to hear Plaintiff-Appellees' claims under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.

On November 19, 2018, the district court ruled on the parties' cross motions for summary judgment. App. 1334–65. In so doing, the district court, among other things: (1) granted Appellees' motion for partial summary judgment, ruling that the officers violated the Fourth Amendment when they entered the curtilage and interior of the Luer-Steinebach home; and (2) denied the officers' motion for summary judgment, ruling that the officers were not entitled to qualified immunity on the issue of whether they violated the Fourth Amendment when they entered the curtilage and the interior of the Luer-Steinebach home. App. 1362–63.

This Court has jurisdiction over both of the above-referenced rulings because they turn on the same legal issue. *Sherbrooke v. City of Pelican Rapids*, 513 F.3d 809, 813 (8th Cir. 2008). As explained *infra* at 42, Appellees do not believe any material facts are in dispute. However, because the appeal is premised on the district court's rejection of the qualified-immunity defense, the Court must take any disputed facts it concludes are material in the light most favorable to Appellees. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## STATEMENT OF THE ISSUES

I.   Whether the officers violated Appellees' Fourth Amendment rights when they entered and searched the curtilage of the Luer-Steinebach home without a warrant and absent exigent circumstances?

*Collins v. Virginia*, 138 S. Ct. 1663 (2018)

*United States v. Williams*, 521 F.3d 902 (8th Cir. 2008)

*United States v. Waldner*, 425 F.3d 514 (8th Cir. 2005)

II.  Whether the officers violated Appellees' Fourth Amendment rights when they entered and searched the interior of the Luer-Steinebach home without a warrant and absent exigent circumstances?

*United States v. Wells*, 648 F.3d 671 (8th Cir. 2011), *affirming* No. 1:09cr130, 2010 WL 2520525 (E.D. Mo. June 14, 2010)

*Rogers v. Carter*, 133 F.3d 1114 (8th Cir. 1998)

*United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980)

*Payton v. New York*, 445 U.S. 573 (1980)

III. Whether the officers are entitled to qualified immunity for entering and searching the curtilage of the Luer-Steinebach home without a warrant and absent exigent circumstances?

*Smith v. Kansas City Police Dep't*, 586 F.3d 576 (8th Cir. 2009)

*United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)

*Florida v. Jardines*, 569 U.S. 1 (2013)

IV.    Whether the officers are entitled to qualified immunity for entering and searching the interior of the Luer-Steinebach home without a warrant and absent exigent circumstances?

*Welsh v. Wisconsin*, 466 U.S. 740 (1984)

*United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010)

*Rogers v. Carter*, 133 F.3d 1114 (8th Cir. 1998)

*United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980)

## STATEMENT OF THE CASE[1]

**I.** ***The Curtilage and Interior of the Luer-Steinebach Home.***

Appellees Jon Luer and Andrea Steinebach are a married couple who live together. Their home is located in a suburban neighborhood in St. Louis County. App. 858 ¶ 2. The Luer-Steinebach home is a single-family house with an attached garage. *Id*. ¶ 1. The north side of the house faces the street. App. 859 ¶ 3.

There is a flagstone pathway directly adjacent to the east side of the Luer-Steinebach house. App. 859 ¶ 4. Arching over the flagstone pathway is a stand of bamboo. *Id*. ¶ 5. The pathway is completely on the Luer-Steinebach property. *Id*. ¶ 6. The pathway begins at the point at which the garage meets the driveway, continues through the side garden, and ends in the family backyard. *Id*. ¶ 7.

There is a pedestrian entrance to the Luer-Steinebach garage on the east side of their house between the flagstone pathway and the garage. *Id*. ¶ 8. That entrance

---

[1] This section is based on the statement of facts that Appellees submitted in support of their motion for partial summary judgment. App. 858–66. The vast majority are undisputed. For the few facts that are disputed—which relate to the number of side doors ajar at the Luer-Steinebach home and the efforts of the officers to rouse the home occupants before entering the interior of the home— Appellees proffered admissible evidence that contradicts the officers' testimony. *See* App. 609–11, 621. Nevertheless, Appellees do not believe those few disputed facts are material, so they accepted the officers' version as true for the purpose of their partial summary judgment motion only. App. 862–64 at nn. 2–6.

Appellees discuss why these facts are immaterial *infra* at 42. However, if the Court disagrees and concludes they are material, Appellees' version of facts must be taken as true. *See Burnikel v. Fong*, 886 F.3d 706, 710 (8th Cir. 2018).

has an external glass storm door and an internal wood door. *Id.* ¶ 9. A person cannot see the side entrance when standing on the street. *Id.* ¶ 10. In addition, a person cannot see the side entrance when standing anywhere on the Luer-Steinebach driveway, or when standing at the entrance to the pathway on the northeast corner of the Luer-Steinebach driveway. App. 860 ¶ 11. Inside the Luer-Steinebach home, there is a solid wood door between the attached garage and the kitchen. *Id.* ¶ 12.

## II.     *The Officer Search of the Luer-Steinebach Curtilage.*

On July 10, 2016, at approximately 2:40 a.m., Officers Clinton and Selz arrived (in two separate vehicles) on the street where the Luer-Steinebach residence is located. *Id.* ¶ 15. *See also* App. 1189:2-4. The officers had been dispatched to investigate a theft—a person's failure to pay a cab fare of approximately $50 to $65—which is a misdemeanor. App. 860 ¶ 16. The cab driver had called 911 to report that his customer had failed to pay the fare. *Id.* ¶ 17.

At first, the officers had some difficulty locating the cab driver because the address provided to them was inaccurate. App. 1190:1-12. They drove down three or four different streets before they found him. *Id.* Eventually they encountered the cab on the street of the Luer-Steinebach residence. App. 1190–91. The cab was located to the left (east) of the Luer-Steinebach residence; it "wasn't parked in front of any particular house at the time." App. 1051:7-15; App. 1190:19–1191:2.

12

At the time, it was dark outside, and there were no visible lights on inside or outside the Luer-Steinebach residence. App. 860 ¶ 18. The first thing the officers did when they arrived was to make contact with the cab driver. App. 861 ¶ 19.

The cab driver told the officers the customer was intoxicated. *Id*. ¶ 20. However, the cab driver did not tell the officers anything about drugs or weapons. *Id*. ¶¶ 21–22. In fact, there are no facts to support an assertion that the customer was armed with a weapon. *Id*. ¶ 23.

The cab driver told the officers that the customer had run or jogged "from his car towards the houses," but "[h]e didn't know where he went." *Id*. ¶ 24. *See also* App. 1056:15-18 ("The only thing he told us was he gave me a description of what had happened when the customer got out of the car and then the individual disappeared in between the two houses.") (emphasis added); 1191:14-23 ("[the driver] pointed toward the neighbor's house, the Luer—just in that—in a general direction"). Significantly, the cab driver did not see the customer go *inside* any home, including the Luer-Steinebach home. App. 861 ¶ 25.

After the cab driver had given that brief description, Officer Clinton immediately went on foot into the yard of Appellees' next-door neighbor to the east. *Id*. ¶ 28. Next, Officer Clinton went away from the street on foot between the two houses to the east of the Luer-Steinebach home. App. 862 ¶ 29. After that, Officer Clinton went on foot across the backyard of Appellees' next-door

neighbor. *Id*. ¶ 30. Once he reached the west side of the neighbor's backyard, Officer Clinton came back toward the street between the Luer-Steinebach house and the next-door house. *Id*. ¶ 31. As he was going between the houses, Officer Clinton entered onto the stone pathway immediately adjacent to the Luer-Steinebach home. *Id*. ¶ 32; *see also* App. 1224:19–1225:1.

Officer Clinton testified that his intent when he was on the neighbors' property and the Luer-Steinebach property was to make a "protective sweep" in order "to visualize the area for any dangers that might be associated." *Id*. ¶ 33. Officer Clinton did not find anyone hiding on the Luer-Steinebach property or on the property of their next-door neighbor. *Id*. ¶ 34.

Officer Clinton first saw the side entrance to the attached Luer-Steinebach garage when he was on their stone pathway. *Id*. ¶ 35. Clinton testified that when he saw the side entrance, Officer Clinton saw that the external glass storm door was open two to three inches. *Id*. ¶ 36. After he saw the storm door ajar, Officer Clinton moved closer to the side entrance and saw the adjacent wood door was open. App. 863 ¶ 37.[2]

---

[2]     Appellees dispute that anything other than the wood door was open, *see* App. 609–11, but do not believe this fact is material for the reasons given *infra* at 42. If found to be material, this fact must be taken in the light most favorable to them. *See Burnikel*, 886 F.3d at 710.

Once Officer Clinton returned to the front of the Luer-Steinebach home and met back up with Officer Selz, the officers decided to "try to make contact to see if anybody was home at the residence." *Id.* ¶ 40. The officers knocked at the front door and rang the doorbell.[3] *Id.* ¶ 41. Then they circled the house, proceeding through the yard to the west side of the Luer-Steinebach home, south to the backyard, across the backyard, and then again north up the flagstone pathway immediately adjacent to the east side of the house (back toward the street). *Id.* ¶ 42. The officers testified that they knocked on windows and a sliding glass door in the back of the house. *Id.* ¶ 43. During the entire time the officers were on the Luer-Steinebach property, everything remained dark inside the house and they did not hear any noises from inside the house. App. 864 ¶ 44.

Both Officer Clinton and Officer Selz knew that the pathway was part of the curtilage of the Luer-Steinebach home. App. 863 ¶ 38. The officers testified that when they arrived at the side entrance to the attached garage (Clinton for the second time and Selz for the first time), neither officer had any idea whether a burglary was happening. App. 864 ¶ 45. Nevertheless, they proceeded to enter the attached garage through the side entrance. *Id.* ¶ 46.

---

[3]    Although not material for the reasons stated *infra* at 42, Appellees dispute that the officers rang the doorbell, used the door knocker, or made any loud knocking sound. *See* App. 621; 904:7–905:6. If found to be material, this fact must be taken in the light most favorable to them. *See Burnikel*, 886 F.3d at 710.

**III.** *The Officer Search of the Luer-Steinebach Interior.*

Before the officers entered the garage, they drew their weapons. *Id.* ¶ 47. The officers proceeded across the garage to the interior wood door between the garage and the kitchen. *Id.* ¶ 48. They did not knock on that interior door. *Id.* ¶ 49. Instead, they proceeded through the door and into the kitchen. *Id.* ¶ 50.

After they went into the kitchen, the officers went down the basement stairs, and Officer Clinton searched the basement. *Id.* ¶ 51. The officers came back upstairs, proceeded on foot through the kitchen, and entered the main living area. *Id.* ¶ 52. When Luer encountered the officers, they were standing at the entrance to the hallway between the main living area and the family bedrooms. App. 865 ¶ 53. The officers' weapons were unholstered when they first saw Luer. *Id.* ¶ 54.

Appellees Luer and Steinebach were asleep when the officers entered their property. App. 901:21–902:3; App. 658:17-22. Therefore, neither gave (or could have given) consent to the initial entry and search of the curtilage and interior of their home. App. 863 ¶ 39; App. 1339–40; App. 1079:6-11. Moreover, Officers Clinton and Selz did not obtain a warrant to search the Luer-Steinebach property or any part thereof. App. 861 ¶ 26; App. 1339.

**IV.** *Relevant District Court Proceedings.*

In Count I of the operative complaint, Appellees Luer and Steinebach alleged that Officers Clinton and Selz violated their rights under the Fourth

Amendment when they entered the curtilage and interior of the Luer-Steinebach home without consent, a warrant, or exigent circumstances. App. 10–11; *see also* App. 5.[4] After discovery had ended, Appellees filed a motion for partial summary judgment. App. 855–57. Appellees sought summary judgment on five issues: that Officers Clinton and Selz (1) acted under color of law at all relevant times; (2) did not have a warrant; (3) did not have consent; (4) violated the Fourth Amendment when they entered the curtilage of the Luer-Steinebach home; and (5) violated the Fourth Amendment when they entered the interior of the Luer-Steinebach home. App. 855–56; App. 1269; 1318 (briefs in support).

The appellant officers simultaneously filed their own motion for summary judgment.[5] App. 37; App. 828 (briefs in support). As relevant to this appeal, the officers moved for summary judgment on Count I based on a defense of qualified immunity. App. 37.

After the parties had fully briefed their cross-motions, the district court issued a memorandum and order granting Luer and Steinebach's motion for partial summary judgment and (except as to claims not at issue on this appeal) denying

---

[4]    Appellees raised two other claims, but they have been dismissed and are not at issue in this appeal. *See* App. 11–13; App. 588 n.1; App. 1338 n.3 and 1358–61.

[5]    St. Louis County, which was a separate defendant, joined the officers' motion for summary judgment on a claim not at issue. App. 1358–61.

the officers' motion for summary judgment. App. 1334. At the outset, the district court concluded that, taking the material facts in the light most favorable to the officers, Luer and Steinebach were entitled to judgment that the officers were acting under color of law, did not have a warrant, and did not have consent to their initial entry into the curtilage or interior of the Luer-Steinebach home. App. 1339–40. The district court next concluded that, again taking the material facts in the light most favorable to the officers, Luer and Steinebach were entitled to summary judgment that the officers violated their Fourth Amendment rights when they entered the curtilage and interior of their home. App. 1340–53. Finally, the district court concluded that the right of Luer and Steinebach to be secure in their home under the circumstances here was clearly established at the time of the officers' intrusion and that, therefore, the officers were not entitled to qualified immunity. App. 1353–58.

## **STANDARD OF REVIEW**

Defendant-Appellants have appealed the denial of their motion for summary judgment and the grant of Plaintiff-Appellees' motion for partial summary judgment, both on qualified-immunity grounds. Br. at 13.

In the absence of material disputed facts, rejection of a qualified-immunity defense is a question of law that this Court reviews *de novo*. *Herts v. Smith*, 345 F.3d 581, 584 (8th Cir. 2003).

For the reasons stated *infra* at 42, Appellants do not believe there are any disputed facts relevant to the question of qualified immunity. However, if the Court disagrees and concludes there are disputes of fact material to the decision on whether qualified immunity is appropriate, those facts and their reasonable inferences must be taken in the light most favorable to Appellees, as they are the nonmovant as to this issue: that is, the party *not* asserting qualified immunity. *Burnikel v. Fong*, 886 F.3d 706, 710 (8th Cir. 2018); *Wallace v. City of Alexander*, 843 F.3d 763, 767–68 (8th Cir. 2016); *see also Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

**SUMMARY OF THE ARGUMENT**

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 589–90 (1980). Thus, "[a]bsent exigent circumstances, that threshold may not be reasonably crossed without a warrant." *Id*. The district court correctly concluded that Officers Clinton and Selz unlawfully crossed that threshold here and that—in the absence of exigent circumstances not even arguably present here—Luer and Steinebach's right to be secure against this kind of warrantless police entry in the middle of the night was clearly established.

**First**, Officers Clinton and Selz unlawfully entered and searched the curtilage of the Luer-Steinebach home. The officers were dispatched to investigate a misdemeanor: an intoxicated customer's alleged failure to pay cab fare of less than $65. They had no information that the alleged scofflaw had any weapon or any particular connection to the Luer-Steinebach property, and they could not have reasonably believed that he posed sufficient danger to justify such serious police intrusion. The officers never saw the customer. The cab driver reported only that the customer had left the cab, failed to pay, gone in the "general direction" of the Luer-Steinebach house and a neighboring house, and disappeared between two houses. It is clearly established that, when not in hot pursuit, police without a warrant cannot enter and search the curtilage of a dark and quiet home in the middle of the night to track down an alleged misdemeanant accused of a

20

nonviolent crime. *See Collins v. Virginia*, 138 S. Ct. 1663 (2018); *Smith v. Kansas City Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009); *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005).

**Second**, Officers Clinton and Selz unlawfully compounded their initial Fourth Amendment violation by entering and searching the interior of the Luer-Steinebach house. After Officer Clinton had entered the Luer-Steinebach side garden and trod upon the flagstone pathway directly adjacent to their home, he noticed a door ajar to the side entrance of their attached garage. The officers claim—either because it constitutes a purported "exigent circumstance" or because it was discovered in the course of a purported "protective sweep"—that an open side door at the Luer-Steinebach residence meant the cab customer might be inside, which justified further intrusion into the interior of the home. However, whatever concern the officers might have had is not grounded in fact: there was no report that the customer had entered (or even had any connection to) the Luer-Steinebach house; no allegation that the customer brandished a weapon (or posed any danger whatsoever); and no disturbance whatsoever (or even any kind of noise or light) emanated from the dark, quiet Luer-Steinebach home.

Under these circumstances, there was no lawful basis for the officers to enter and search the house. *See, e.g.*, *United States v. Wells*, No. 1:09cr130, 2010 WL 2520525 (E.D. Mo. June 14, 2010), *aff'd*, 648 F.3d 671, 673–79 (8th Cir. 2011);

*Patzner v. Burkett*, 779 F.2d 1363, 1367–68 (8th Cir. 1985). At the time of the intrusion, Luer and Steinebach had a clearly established right to be free of warrantless home entries under the circumstances present here: an allegation of a misdemeanant accused of a minor, nonviolent offense fleeing in the "general direction" of their home before the police arrived on the scene.

Indeed, taken together, the circumstances here warrant the denial of qualified immunity. *See Smith v. Kansas City Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009) (holding that district court properly denied qualified immunity where "the officers saw no other adult acting suspiciously inside the home and had no reason to believe weapons were there"); *Mitchell v. Shearrer*, No. 4:10cv819, 2012 WL 943322, at \*4 (E.D. Mo. March 20, 2012) (denying motion for qualified immunity based on principle that "[a] warrantless home entry to arrest an individual suspected of committing a minor crime requires a greater showing of exigency than a warrantless home entry to arrest an individual suspected of a more serious crime"), *aff'd*, 729 F.3d 1070 (8th Cir. 2013) (affirming denial of qualified immunity for warrantless entry through doorway to effect arrest and holding that "a reasonable officer would have known that at the time [the suspect] tried to close the door, he stood within his home and thus could not be pulled therefrom and placed under arrest in the absence of exigent circumstances").

# ARGUMENT

**I.** **The officers violated Appellees' Fourth Amendment rights when they entered and searched the curtilage of their home without a warrant and absent exigent circumstances, and characterizing those searches as a "protective sweep" does not cure their unconstitutionality.**

"[T]he Fourth Amendment's protection of curtilage has long been black letter law." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018). Specifically, "the Court considers curtilage—the area 'immediately surrounding and associated with the home'—to be 'part of the home itself for Fourth Amendment purposes.'" *Id.* (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)) (in turn quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). It is undisputed that Officer Clinton entered and searched the Luer-Steinebach side garden and walked upon the stone pathway immediately adjacent to their home and that, later, both officers went on foot across the entire backyard and then walked down the pathway a second time. App. 858–66 ¶¶ 31, 32, 35, 42–46. As the officers themselves testified, these forays were physical intrusions into the curtilage of the Luer-Steinebach home. *Id.* ¶ 38; *see also Jardines*, 569 U.S. at 6; *Collins*, 138 S. Ct. at 1670.

Because neither Luer nor Steinebach gave consent, the officers needed either a warrant or exigent circumstances to enter and search the curtilage of the Luer-Steinebach home. App. 858-66 ¶¶ 38, 39. Nonetheless, they did not obtain a warrant, *id.* ¶ 26, and were not presented with exigent circumstances. *Id.* ¶¶ 15–28. Perhaps recognizing this deficit, the officers now claim they were also entitled to

intrude upon the Luer-Steinebach curtilage to conduct a protective sweep, but that assertion is legally wrong and unsupported by articulable facts.

### i. *No exigent circumstances*

Whenever police conduct a search, that search must be objectively reasonable if it is to comply with the Fourth Amendment. *E.g., Ohio v. Robinette*, 519 U.S. 33, 39 (1996). Nowhere is a search less likely to be reasonable than in a person's home. *Payton*, 445 U.S. at 590. The Supreme Court has long defined "home" to include its interior and its immediate exterior. *Collins*, 138 U.S. at 1670 (holding that protection of privacy at home is at the "very core" of the Fourth Amendment); *Payton*, 445 U.S. at 590 ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms[.]"); *Jardines*, 569 U.S. at 6 (holding that curtilage is "part of the home itself for Fourth Amendment purposes" and the right to retreat into one's home "would be of little practical value" if area immediately surrounding home were not included) (first quote from *Oliver*, 466 U.S. at 180)).

Because of the longstanding respect for the privacy of the home, warrantless home searches are "*per se* unreasonable" unless they fall within one of "a few specifically established and well-delineated exceptions." *United States v. Harris*,

747 F.3d 1013, 1016 (8th Cir. 2014) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971) (holding that exigency-based warrant exceptions are "carefully defined"); *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005) (holding that warrantless searches "are presumptively unreasonable, subject to a few specifically established exceptions"); *United States v. James*, 353 F.3d 606, 612–13 (8th Cir. 2003) ("The Warrant Clause is not a technicality. It is a basic protection of a citizen's right of private property.").

Whenever a warrantless search has taken place and "the government wishes to rely on an exception" to the warrant requirement in order to justify the lack of warrant, that government "bears the burden of demonstrating that the exception exists." *James*, 353 F.3d at 613; *see also Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests.").

One such exception to the warrant requirement is the existence of emergency (or exigent) circumstances. "Exigent circumstances are present when lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008) (holding also that "the situations of urgency protected by this [exigency] exception cannot be created by police officers"); *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). To show

25

that exigent circumstances justified a warrantless intrusion into a person's curtilage, police officers must show that "a reasonable, experienced police officer would believe" that "the exigencies of the situation ma[d]e the needs of law enforcement so compelling" that the presumption of unreasonableness accompanying a warrantless home search was overcome. *United States v. Ramirez*, 676 F.3d 755 (8th Cir. 2012) (first quotation); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (second quotation).

Taking those well-defined exigencies in reverse order, it is <u>first</u> undisputed that Officers Clinton and Selz did not fear (and could not reasonably have feared) the destruction of evidence. App. 858-66 ¶¶ 15–28. It is hard to even imagine what evidence relating to the misdemeanor theft of cab service could be destroyed. But in any event, the Luer-Steinebach property was quiet and dark and the cab driver had reported nothing about the imminent destruction of anything. *See, e.g., Ramirez*, 676 F.3d at 763 (holding that where officers "heard no sounds at all" from hotel room, destruction-of-evidence exigency did not exist to permit warrantless entry into room).

<u>Second</u>, the "imminent escape" rationale, also called "hot pursuit," cannot justify a warrantless intrusion into the curtilage of a private home when the officers never had the suspect in view. *See United States v. Anderson*, 688 F.3d 339, 344

26

(8th Cir. 2012) (holding that, for exception to apply, government must demonstrate "immediate or continuous pursuit of the suspect from the scene of the crime").

Finally, the undisputed evidence shows that the officers never *at any time*—much less at the time of the initial entry and search—had a reasonable belief that "lives [were] threatened." *Williams*, 521 F.3d at 908. *See* App. 858-66 ¶¶ 22–23 (no report customer with unpaid cab fare had any kind of weapon); ¶¶ 10–12 (no one can see there is a side entrance to the Luer-Steinebach house—much less whether the door thereto is open—unless already inside their curtilage); ¶ 44 (no noise coming from interior or curtilage of home); ¶ 45 (no information one way or another about whether customer with unpaid cab fare had entered home). *See also United States v. Conner*, 948 F. Supp. 821, 849 (N.D. Iowa 1996) (holding that where "defendants were believed to have committed a burglary," but it was not one "in which a threat of force or actual force was used against anyone," officers could not rely on exigent circumstances to enter protected place without a warrant), *aff'd* 127 F.3d 663 (8th Cir. 1997) (holding that warrantless entry into motel room was unlawful and that police could not have reasonably believed exigency justified intrusion on occupants' reasonable expectation of privacy).

### ii. *Protective-sweep doctrine inapplicable*

Implicitly recognizing that no exigent circumstances existed, the officers attempt to characterize Officer Clinton's first entry and search as a "protective

sweep." App. 858-66 ¶ 33. But his warrantless search spanning multiple suburban backyards and the Luer-Steinebach side garden cannot be justified under the protective-sweep doctrine, particularly in the absence of any report of violence.

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that a protective sweep "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id*. at 327. The Fourth Amendment permits a protective sweep if the searching officer possessed "a **reasonable** belief based on **specific and articulable facts**" which, taken together with the rational inferences from those facts, reasonably warranted the officer's belief that "the area swept harbored an individual **posing a danger** to the officer or others." *Id*. (emphases added).

In *United States v. Waldner*, 425 F.3d 514 (8th Cir. 2005), the Eighth Circuit joined other circuits in holding that *Buie* applies to "non-arrest situations but only under the second prong of *Buie*, which requires a showing of a reasonable suspicion of dangerous individuals in the house." *Id*. at 517. Applying this standard, the *Waldner* court held that there was "no evidence that the officers had any articulable facts that an unknown individual might be in the office or anywhere else in the house, ready to launch an attack." *Id*. As a result, the court held that the protective sweep had exceeded its permissible scope under the Fourth Amendment. *Id*. *See also Smith*, 586 F.3d at 580 ("On the facts here, [the officer's] belief that an

28

unarmed domestic violence suspect was inside the home does not justify a protective sweep.") (approving *United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir. 1990) ("the danger justifying a protective sweep comes from the possible presence of armed and dangerous persons in the vicinity")); *see also Patzner v. Burkett*, 779 F.2d 1363, 1367–68 (8th Cir. 1985) (holding that police officer who entered an intoxicated suspect's open front door to make warrantless arrest after suspect had reportedly caused car accident violated Fourth Amendment and that, "[o]n the facts of this case, the claimed threat to public safety [wa]s unconvincing").

Taking as true Officer Clinton's assertion that he first entered the Luer-Steinebach curtilage because he was intending to conduct a protective sweep, he had no reasonable belief that a dangerous individual was nearby, ready to launch an attack. At *most* he believed an intoxicated taxicab customer without a weapon was hiding in some unspecified residential backyard some tens of feet away from the street where he was standing with the taxi driver. That belief does not justify his physical intrusion into Appellees' private, protected space.[6] *See Jardines*, 569 U.S. at 7 ("While law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is

---

[6]     Officer Selz also later unlawfully entered into the curtilage of the home. *See* App. 858-66 ¶¶ 42–46.

sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas.") (internal quotation marks and citation omitted).

Even in a situation where an arrest is actually being effectuated, outdoor protective sweeps are viewed with suspicion. *See United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004) (suppressing evidence found in backyard after alleged "protective sweep" done during arrest and holding that "[t]he protective-sweep doctrine arose in the context of an arrest in a home. . . . [t]he risk is substantially diminished when the officers effect the arrest outside the home"). In *Carter*, the Tenth Circuit commented that, "[o]f course, there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*." *Id.* at 1243; *accord United States v. Delgado-Perez*, 867 F.3d 244, 256 (1st Cir. 2017).

Under *Buie* and *Waldner*, an officer must have specific, *articulable facts* that would lead him to believe reasonably that the area he is "sweeping" harbors not just any person accused of committing any crime but a person who *poses a danger* to others. The undisputed evidence shows the officers had no facts that would have led an experienced, reasonable officer to believe that the customer who failed to pay his cab fare on the street was harboring within the Luer-Steinebach curtilage and posed any danger whatsoever.

The officers argue that they view *all* suspects as armed and dangerous. That may be so, but it is irrelevant to whether protective-sweep doctrine can justify the warrantless search they conducted under the circumstances present here. Indeed, it would turn the required burden of proof on its head. When "the government wishes to rely on an exception to the warrant requirement" to justify a presumptively unreasonable search, *the government* "bears the burden of demonstrating that the exception exists." *James*, 353 F.3d at 612–13. To conclude that the officers could fulfill this responsibility by pointing merely to their general wariness toward criminal suspects would impermissibly shift the burden of proof away from the government.

In any event, *Buie* itself already rejected the contention that the absence of information about a suspect's dangerous nature is sufficient to justify a protective sweep on constitutionally protected property. *See Buie*, 494 U.S. at 334 (describing protective-sweep standard as "no more and no less" than *Terry* standard, which *Buie* quotes as forbidding warrantless search "on a mere inchoate and unparticularized suspicion or 'hunch' that [an officer] is dealing with an armed and dangerous individual") (internal quotation marks omitted). *Accord Smith*, 586 F.3d at 581 (holding that "a reasonable officer understood that it was unlawful to enter a home without a warrant, absent consent or exigent circumstances" and district court had properly denied qualified immunity to officer who conducted purported

"protective sweep" inside home where he believed "unarmed domestic violence suspect" was located).

Therefore, neither exigent circumstances nor protective-sweep doctrine can even arguably justify the officers' intrusions into the constitutionally protected curtilage of the Luer-Steinebach home.

**II.    The officers violated Appellees' Fourth Amendment rights when they entered and searched the interior of their home without a warrant and absent exigent circumstances.**

Between the time Officer Clinton first intruded upon the Luer-Steinebach curtilage and the time both officers entered the attached garage and the main living quarters of the home, nothing material had changed. The house was still dark and quiet; the cab driver had reported nothing new; and the police neither saw nor heard any person acting suspiciously. The *only* difference was that—after unlawfully searching the curtilage—Officer Clinton had noticed a side door ajar.[7] *Even assuming* this fact alone were sufficient to transform the absconding cab customer into a burglar *and* to supply an objectively reasonable belief that he was inside that particular house, this Court has already held that an open door does not

_____

[7]    Again, the officers conceded that the state of the doors is immaterial because they believe an unlocked door would have created the same purported exigency, *see* App. 833, and in any event, Appellees discuss why these facts are immaterial *infra* at 42. However, if the Court disagrees and concludes they are material, Appellees' version of facts must be taken as true. *See Burnikel v. Fong*, 886 F.3d 706, 710 (8th Cir. 2018).

allow police to enter a home to arrest a non-resident fugitive without a warrant. *United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010).

"It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quotation marks omitted). "It is not surprising, therefore, that the [Supreme] Court has recognized, as a basic principle of Fourth Amendment law, that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 748–49. To overcome this presumption, again, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Id*. at 749–50.

*Welsh* is instructive because some of its facts are materially similar. In particular, the *Welsh* Court recognized that "the gravity of the underlying offense" is an "important factor to be considered" in determining whether an exigency created an urgent need to conduct a warrantless home entry. *Id.* at 752. The Court held that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id*.

This Court too has held that officers violated the Fourth Amendment in conducting warrantless home arrests when relatively minor offenses had been committed. *See*, *e.g.*, *Rogers v. Carter*, 133 F.3d 1114, 1119 (8th Cir. 1998)

(holding that warrantless home arrest for disorderly conduct was illegal); *Patzner*, 779 F.2d at 1368 (holding that warrantless home arrest for driving under the influence was illegal, even though officer entered through open front door).

Here, the alleged offense was at least as minor—and even less urgent—as the intoxicated-driving offense at issue in *Welsh*: the misdemeanor failure by a customer to pay cab fare of less than $65. App. 858-66 ¶¶ 15–17; *see also* Mo. Rev. Stat. § 570.030.[8] The officers were not in hot pursuit; to the contrary, the customer had "disappeared" before they arrived at the scene. App. 1056:15-18; *see also* App. 1191:14-23. Indeed, Officers Clinton and Selz testified that they had no idea whether the customer had fled or not, and that, in fact, the taxi driver did not know where the customer had gone either. *See* App. 858–66 ¶¶ 24, 25, 27, 28. Further, there was no noise emanating from the house that would have led a reasonable officer to believe anyone was in danger. App. 864 ¶ 44. Under these circumstances, there was no exigency justifying the warrantless entry and search of the interior of the Luer-Steinebach home.

---

[8] Under Missouri law, stealing a property or service worth less than $150 is a class D misdemeanor for a first-time offender and a class A misdemeanor for a person convicted of a previous stealing-related offense.

### a. *Open door insufficient to create exigency*[9]

As the district court noted, the facts surrounding the officers' warrantless entry into the interior of the Luer-Steinebach home "are not dissimilar" to those in *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980). App. 1352. In *Selberg*, a neighbor called police to report that Selberg had left his home the day before, that the neighbor had later noticed that Selberg's door was open, and that he was concerned this was indicative of a burglary. *Id.* at 1294. When officers arrived, they knocked, and, after receiving no response, they entered the home. *Id.* The district court found that exigent circumstances justified the officers' entry into Selberg's home, but the Eighth Circuit reversed. It concluded that the warrantless entry was "carried out under circumstances which did not objectively demonstrate any emergency threat to persons or property," as the officers knew only that the neighbor reported suspicion of a burglary, and the door was open, but the home showed no signs of vandalism or other criminal activity, and the officers had "no reason to believe a crime had been or was being committed and that entry was necessary." *Id.* at 1297. As the district court below concluded:

---

[9]     Again, the officers conceded that the state of the doors is immaterial because they believe an unlocked door would have created the same purported exigency, *see* App. 833, and in any event, Appellees discuss why these facts are immaterial *infra* at 42. However, if the Court disagrees and concludes they are material, Appellees' version of facts must be taken as true. *See Burnikel v. Fong*, 886 F.3d 706, 710 (8th Cir. 2018).

> The circumstances in *Selberg* would seem more likely to indicate the presence of exigent circumstances than in the instant case, since in *Selberg* the neighbor reported his concern that a burglary had occurred at a particular home, whereas here, no one had reported any concerns about criminal activity at the particular home the Officers entered, yet in *Selberg* the Eighth Circuit found no exigency justified the warrantless entry.

App. 1352.

*United States v. Wells*, 2010 WL 2520525 (E.D. Mo. June 14, 2010), *aff'd*, 648 F.3d 671 (8th Cir. 2011), is also instructive. In that case, police officers received a tip that Wells was manufacturing methamphetamine in an outbuilding behind his house. 648 F.3d at 673. As they drove past his house at approximately 3:00 a.m., the officers noticed two open doors, which had been closed on previous passes. *Id*. According to one of the officers, it was "possible" that "the open doors signified a burglary." *Id*. As such, the officers proceeded to enter the curtilage to the residence. *Id* at 673–74.

The district court had flatly rejected the officers' claim that exigent circumstances justified the warrantless entry into the curtilage:

> The alleged exigency is based solely on the officers' observation of an open door to a vehicle parked on the street in front of the defendant's residence and an open door to a storage shed located on the far right corner of the property which gave rise to his concern that a burglary may have been in progress. Viewing the claim from the totality of the circumstances, this Court first notes that the perceived burglary did not involve the kind of exigency that necessarily requires an immediate police response to save one from life or limb or from serious destruction or deprivation of his or her property.

2010 WL 2520525, at *3 (citing *Selberg*).

On appeal, the Eighth Circuit noted that the government did not even appeal the district court's conclusion that its open-door "claim of exigent circumstances as an exception to the warrant requirement [was] simply too weak to pass constitutional muster." 648 F.3d at 679. *Accord Greer*, 607 F.3d at 563 (holding that, absent an exigency, even "[p]robable cause that a fugitive was located within the house did not justify entry without a warrant," rejecting the district court's conclusion that "it made a difference that the door from the porch to the house was open rather than closed," holding that "the status of the door is not determinative," and ruling that the warrantless entry was unlawful) (relying on *Payton*, 445 U.S. at 578, 590, and *Steagald v. United States*, 451 U.S. 204 (1981)); *Mitchell*, 729 F.3d at 1076 (holding that, although suspect himself was standing just inside open door, "a reasonable officer would have known that at the time [suspect] tried to close the door, he stood within his home and thus could not be pulled therefrom and placed under arrest in the absence of exigent circumstances").

The officers claim, based on nothing but the doors Clinton saw after unlawfully entering the curtilage, that the cab customer might have entered the Luer-Steinebach home to commit a burglary. That belief was not objectively reasonable based on the totality of the circumstances present here—among them, a minor, nonviolent alleged offense; no allegation of a weapon; no particular

37

connection between the suspect and the Appellees' home; and a dark, quiet house without signs of vandalism or disturbance. But even if it had been, that "perceived burglary did not involve the kind of exigency that necessarily requires an immediate police response to save one from life or limb or from serious destruction or deprivation of his or her property." *Wells*, 2010 WL 2520525, at *3. *See also Patzner*, 779 F.2d at 1368; *Conner*, 127 F.3d at 667.

Officers Clinton and Selz cannot establish that their perception that there could be a burglary created an emergency that justified their warrantless entry and search of the interior of the Luer-Steinebach residence. The officers were not in hot pursuit of the customer; there was no indication that any evidence was being destroyed; and there was no objectively reasonable basis to believe that lives were threatened, especially given the dark, quiet house and the absence of any threat of violence. At most, the Officers Clinton and Selz were simply investigating an imagined possible burglary, which they acknowledge they had no idea was actually taking place. *See* App. 858-66 ¶ 45.

### b. *Cases where officers were in continuous hot pursuit or emergency aid was needed do not apply here*

The officers discuss several cases in which a warrantless entry was permissible, but in those cases, the officers had an objectively reasonable basis—grounded in specific, articulable facts—for believing that emergency aid was needed or that hot pursuit justified the entry.

The officers rely on *Brigham City v. Stuart*, 547 U.S. 398 (2006) (Br. at 20-21) in support of the assertion that they "were confronted with *ongoing* violence occurring *within* the home; a situation *Welsh* did not address." Notably, the Officers do not—because they cannot—point to any evidence to support their claim that they were "confronted with ongoing violence" inside the Luer-Steinebach residence. To the contrary, the officers knew at the time that the house had been dark and quiet the whole time they were on the scene, including when they were up close to the exterior walls; the taxi driver had not reported a weapon or accused the alleged misdemeanant of violent conduct; and they had no idea whether the customer had entered the Luer-Steinebach house (or any house) or had fled into the night. App. 858–66 ¶¶ 24, 25, 27, 28. In contrast, in *Brigham* the Court held that the officers lawfully entered a home without a warrant when they heard an ongoing fight, "loud and tumultuous" noises, "thumping and crashing" shouts of "stop, stop" and "get off me," and—when they moved into the backyard—observed one person punch another in the face, sending that person "to the sink, spitting blood." 547 U.S. at 406.

The officers' reliance on *Stanton v. Simms*, 571 U.S. 3 (2013) (Br. at 21), is also misplaced. In that case, the Court granted qualified immunity to a police officer who "*was* in hot pursuit of [a suspect] Patrick" and "*did* see Patrick enter Simms' property." 571 U.S. at 10 (emphasis in original). In contrast, here, the

officers were not in hot pursuit of the customer. In fact, they not only never personally saw the customer enter the Luer-Steinebach residence but also had not even received a secondhand report that such a thing had happened. App. 861 ¶ 25.

In *Carroll v. Carman*, 135 S. Ct. 348 (2014) (per curiam), another case on which the officers rely (Br. 21), the Supreme Court reserved judgment about the constitutionality of the officers' actions but applied qualified immunity. In so doing, the Court focused on what an objectively reasonable officer would believe based on the information at hand: the *Carroll* officers had received a report that a man "had stolen a car and two loaded handguns" *and* that the man might have fled specifically to the plaintiffs' home. 135 S. Ct. at 348. Similarly, in *Warden v. Hayden*, 387 U.S. 294 (1967) (Br. at 22), the officers had received a report that a man had committed an armed robbery minutes before, had fled, and had entered a specific home. *Id*. at 297–98. Unlike the officers in *Carroll* and *Warden*, Officers Clinton and Selz had *no* information about the customer carrying a weapon or entering a specific home. The cab driver did not report that he had seen or even suspected the customer had a gun or that the customer had entered the Luer-Steinebach residence.

*Illinois v. McArthur*, 531 U.S. 326 (2001) (Br. at 21–22), is also not applicable: it did not involve a warrantless search at all but rather a police officer's *seizure* of a home—his refusal to allow the defendant to enter—until a valid search

warrant could be (and was) obtained. Although *McArthur* does discuss *Welsh* and distinguish between jailable and nonjailable offenses, that discussion is in the context of "the need to preserve evidence," a consideration not present here. *Id.* at 336. Even if it were, the distinction between *McArthur* and *Welsh* also turns on the nature of the intrusion, which the *McArthur* Court considered "less serious" than the warrantless home entry in *Welsh*: "the restriction at issue here is less serious [than in *Welsh*]. Temporarily keeping a person from entering his home, a consequence whenever police stop a person on the street, is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search." *Id.*; *see also Patzner*, 779 F.2d at 1368 (applying *Welsh* to a minor, but jailable, intoxicated-driving offense).

Finally, the officers rely on *Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (Br. at 18), in support of the proposition that it "would be silly to suggest that that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has occurred or is about to (or soon will) occur." However, this principle applies only where police officers have a reasonable basis to believe that exigent circumstances exist. *Compare Burke v. Sullivan*, 677 F.3d 367, 371–72 (8th Cir. 2012) (holding that officers had a reasonable basis to believe "there was either a threat of violence or an emergency requiring attention," where "Burke, who had been thrown against a wall by Jay, was now in the home alone with a

41

violent suspect"), *with Smith*, 586 F.3d at 580–81 (holding that officer was not entitled to qualified immunity for entering home of unarmed domestic violence suspect where, as characterized by *Burke*, the officer "had no information any victim or potential victim was inside the home"). In the case at hand, the officers' reliance on *Georgia* is misplaced because they had even less information than in *Smith*: no report of threat of violence and no facts to make a reasonable judgment one way or the other that *anyone*—either potential suspect or potential victim— was inside the dark, quiet Luer-Steinebach home.

**III.    Appellees' right to be free from unreasonable government intrusions into the curtilage and interior of their home under the circumstances was clearly established at the time and the officers therefore are not entitled to qualified immunity.**

### a.    *No material disputed facts*

No facts material to the grant of summary judgment or the denial of qualified immunity are in dispute. Under the agreed facts, it was objectively unreasonable for the officers to believe they were entitled to enter the curtilage and interior of Appellees' dark, quiet home in the middle of the night, without consent, a warrant, or an exigency, to pursue a suspect who allegedly committed a minor, nonviolent offense in the street near Appellees' home.

However, there are two *nonmaterial* facts in dispute. Everyone agrees that there is a side entrance into the Luer-Steinebach garage and that the entrance has a glass storm door and a solid wood door. Everyone also agrees that there is a solid

wood door between the garage and the kitchen. The first disputed fact is whether each of those doors was ajar before the officers passed through them or whether just one of them was. The second disputed fact is whether the officers knocked and rang the doorbell before entering the interior of the home. *See* App. 609–11, 621.

These facts are not material because, **first**, as this Court has held, "the status of the door is not determinative" as to the propriety of a warrantless home entry to pursue a non-resident fugitive. *Greer*, 607 F.3d at 563; *accord Selberg*, 630 F.2d at 1296. *See also* App. 833 (officers conceding in reply brief that it was "not material as to whether the house doors were ajar or just unlocked" because they claim the same "exigency existed in either scenario"). And **second**, as the Supreme Court has held, the implied license to knock or ring the doorbell at the primary entrance of a home does not excuse otherwise unreasonable warrantless intrusions into the constitutionally protected areas of a private home, including its porch or side garden. *Jardines*, 569 U.S. at 6–8.

The district court likewise concluded that these facts were not material to the denial of qualified immunity. App. 1336 nn. 1–2 (also noting that the officers conceded state of the doors was immaterial). However, if this Court disagrees and believes they are material, it must take those facts in the light most favorable to Appellees and presume that only one side door was ajar and that the officers did not make as much effort to rouse the occupants of the home as they claim. *See*

App. 609–11, 621.[10] If the Court holds that the award of qualified immunity turns on resolution of those disputes of fact, the denial of qualified immunity at this stage must be upheld. *See Guite v. Wright*, 147 F.3d 747, 749–50 (8th Cir. 1998) (affirming district court's denial of qualified immunity because "there is at least a genuine issue whether the officers could have surrounded the home pending the issuance of an arrest warrant").

> **b.      Qualified immunity is not available because it was clearly established at the time that the officers' warrantless entries were objectively unreasonable.**

Qualified immunity involves a two-part test that courts may take in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The first part requires a court consider whether a constitutional right has been violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second part requires a court determine whether that right was clearly established at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *see also Tolan*, 572 U.S. at 656 ("The salient question is whether the state of the law at the time of an incident provided fair warning to the

---

[10]     In addition, the officers make some statements in their brief that Appellees objected to as unable to be asserted in an admissible form. For example, the officers claim that "it is not common in the area of the Luer residence for residents to leave their doors unlocked" and that it would be "unusual" for no one to answer the door of a private home in the middle of the night. (Br. 10–11.) If the Court concludes that these facts would be determinative if properly asserted, it should also consider Appellees' objections. *See* App. 607–10.

defendants that their alleged conduct was unconstitutional.") (internal quotation marks, ellipses, and brackets omitted).

### i. *Constitutional violation*

Parts I and II of Appellees' Argument show why there was a constitutional violation, and Appellees respectfully incorporate them here. *See supra* at 23–42.

### ii. *Clearly established right*

Under the second part of the qualified-immunity inquiry, the district court and this Court consider the question of whether Appellees had a clearly established right to be free of the officers' warrantless entries under the circumstances at issue here. The Eighth Circuit has emphasized that "[o]ur circuit subscribes to a 'broad view' of what constitutes clearly established law; '[i]n the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits and district courts.'" *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001) (quoting *Norfleet v. Ark. Dep't of Human Servs.,* 989 F.2d 289, 291 (8th Cir. 1993)).

"To be clearly established, a right must be sufficiently clear such that a reasonable officer would understand that what he is doing violates that right." *Smith*, 586 F.3d at 581. In Fourth Amendment cases where an officer claims that an exigency excused his failure to obtain a warrant before entering a constitutionally protected area, "this court asks whether the officer 'could have

"reasonably but mistakenly" concluded that exigent circumstances were present based upon the information [the officer] possessed at the time.'" *Id*. (alteration in original) (quoting *Rogers v. Carter*, 133 F.3d 1114, 1119 (8th Cir. 1998)). In 2009, this Court held in *Smith* that "a reasonable officer understood that it was unlawful to enter a home without a warrant, absent consent or exigent circumstances." *Id.*

Officers Clinton and Selz had no consent and no warrant and could not have "reasonably but mistakenly" concluded that some exigency permitted them to conduct a warrantless entry and search of the curtilage and interior of Appellees' dark, quiet home in the middle of the night simply because a person had allegedly committed a nonviolent misdemeanor in the street nearby and fled in the "general direction" of that home and its neighbor.

### 1. *The curtilage of the home*

The following legal principles were clearly established with respect to the officers' unlawful entry and search of the Luer-Steinebach curtilage.

**First**, "the Fourth Amendment's protection of curtilage has long been black letter law." *Collins*, 138 S. Ct. at 1670. Specifically, "the Court considers curtilage—the area immediately surrounding and associated with the home—to be part of the home itself for Fourth Amendment purposes." *Id*. (citations omitted) (quotations omitted).

46

**Second**, to conduct a valid protective sweep, it was clearly established that police officers, based on specific and articulable facts, would have to possess an objectively reasonable suspicion that a dangerous individual was present. *See Waldner*, 425 F.3d at 517 (holding that a protective sweep was impermissible where there was "no evidence that the officers had any articulable facts that an unknown individual might be in the office or anywhere else in the house, ready to launch an attack"); *Smith*, 586 F.3d at 580 ("On the facts here, [an officer's] belief that an unarmed domestic violence suspect was inside the home does not justify a protective sweep.") (approving *United States v. Tisdale*, 921 F.2d 1095, 1097 (10th Cir. 1990) ("the danger justifying a protective sweep comes from the possible presence of armed and dangerous persons in the vicinity")).

**Third**, it was clearly established that exigent circumstances are carefully defined." *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971); *see also United States v. Harris*, 747 F.3d 1013, 1016 (8th Cir. 2014) ("a few specifically established and well-delineated exceptions"). It was clearly established that an exigency exists only "when lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008). Further, the "situations of urgency protected by this [exigency] exception cannot be created by police officers." *Id.* (quoting *United States v. Duchi*, 906 F.2d 1278, 1284 (8th Cir. 1990).

47

Those longstanding principles inexorably lead to the conclusion that the officers could not have reasonably believed they were permitted to enter and search the Luer-Steinebach curtilage without a warrant, regardless of whether the officers label it a protective sweep or an exigency search. The undisputed facts make clear that—other than what might generously be called an "inchoate hunch," *see Buie*, 494 U.S. at 334—there had been no arrest and the officers had no reasonable basis to believe the customer posed any danger, much less that he was within range and "ready to launch an attack." *Waldner*, 425 F.3d at 517. Indeed, the suspect had been accused of "disappearing" after not paying his cab fare. In light of the nature of that alleged minor offense and the undisputedly quiet, dark home that the suspect had no particular connection to, it was objectively unreasonable for the officers to believe that an exigency justified their warrantless entry and search of the Luer-Steinebach curtilage.

In further support, in 2013, the Supreme Court decided *Florida v. Jardines*, 569 U.S. 1 (2013). In *Jardines*, the Court reiterated that the right to "be free from unreasonable governmental intrusion" in one's own home stands at the "very core" of the Fourth Amendment. *Id.* at 6. The Court warned that "that right would be of little practical value if the State's agents could stand in a home's porch **or side garden** and trawl for evidence with impunity." (emphasis added). Given the complete absence of specific facts that the cab customer was armed and ready to

launch an attack—and that therefore the officers' intrusions into the Luer-Steinebach curtilage cannot be justified as a protective sweep—there is nothing the officers could have been doing other than trawling for evidence of the minor offense the customer had allegedly committed. And they entered into the Luer-Steinebach side garden to do it. Although not necessary to deny qualified immunity, the existence of binding precedent on point several years before the officers entered Appellees' curtilage underscores that it was clearly established that the officers' warrantless intrusions upon the Luer-Steinebach curtilage were objectively unreasonable under the circumstances.

### 2. *The interior of the home*

The following legal principles were also clearly established with respect to the officers' unlawful entry and search of the interior of the Luer-Steinebach home. **First**, it was clearly established that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quotations omitted). "It is not surprising, therefore, that the [Supreme] Court has recognized, as a basic principle of Fourth Amendment law, that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id*. at 748–49.

**Second**, it was clearly established that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned

when there is probable cause to believe that only a minor offense, such as [intoxicated driving,] has been committed." *Welsh*, 466 U.S. at 752. *See also Rogers v. Carter*, 133 F.3d 1114, 1119 (8th Cir. 1998) (holding that warrantless home arrest for disorderly conduct was illegal); *Patzner*, 779 F.2d at 1368 (holding that warrantless home arrest for driving under the influence was illegal).[11]

**Third**, it was clearly established that a "claim of exigent circumstances as an exception to the warrant requirement [was] simply too weak to pass constitutional muster" when based on a police officer's assertion that it was "possible" that "open doors signified a burglary." *United States v. Wells*, 2010 WL 2520525 (E.D. Mo. June 14, 2010), *aff'd*, 648 F.3d 671, 673, 679 (8th Cir. 2011); *accord Selberg*, 630 F.2d at 1296; *Greer*, 607 F.3d at 563.

The foregoing, clearly established principles of law demonstrate that the officers could not have reasonably believed that an exigency justified their

---

[11]     The officers also, at times, suggest that their intrusion into the interior of the Luer-Steinebach home could be justified as a second protective sweep. A protective sweep of any part of the interior of a home is permissible only if an officer already has a constitutionally permissible basis—warrant, consent, or exigency—for being inside that home. *See United States v. Spotted Elk*, 548 F.3d 641, 651 (8th Cir. 2008) ("When police have lawfully entered the house in response to exigent circumstances, they may conduct a protective sweep, or cursory inspection.") (emphasis added). Since the objective of the protective-sweep doctrine is to ensure the safety of officers and others from dangerous individuals who happen to be where they are, it was not objectively reasonable to use the doctrine as a justification for the officers' decision to leave one location (curtilage) and enter another (interior), absent some valid warrant exception.

warrantless entry and search of the dark, quiet Luer-Steinebach residence. They were not in hot pursuit; the offense at issue was minor and nonviolent; and there was no report that the alleged offender had a weapon. *See* App. 858-66 ¶¶ 22–23, 25, 44, 45. Thus, based on the totality of the circumstances, "the perceived burglary did not involve the kind of exigency that necessarily requires an immediate police response to save one from life or limb or from serious destruction or deprivation of his or her property." *Wells*, 2010 WL 2520525, at *3. *See also Smith*, 586 F.3d at 580 (affirming denial of qualified immunity); *Mitchell*, 729 F.3d at 1076 (same).

## CONCLUSION

There is no line brighter than the line at the threshold of a person's home. *Payton*, 445 U.S. at 590 ("the Fourth Amendment has drawn a firm line at the entrance to the house"). That was clearly established long before the officers stepped foot in the constitutionally protected areas of the Luer-Steinebach home, and a reasonable, prudent officer would have known it. Under the circumstances, their warrantless entries into the curtilage and interior of the Luer-Steinebach home were objectively unreasonable and violated Appellees' clearly established constitutional rights.

As such, Luer and Steinebach respectfully request that the Court affirm the district court's rulings that: (A) Appellees are entitled to partial summary judgment

that Officers Clinton and Selz violated the Fourth Amendment when they entered

and searched the curtilage and interior of the Luer-Steinebach home; and (B)

Officers Clinton and Selz are not entitled to summary judgment on the basis of

qualified immunity that they violated the Fourth Amendment when they entered

and searched the curtilage and interior of the Luer-Steinebach home.

Respectfully submitted,

*/s/*Anthony E. Rothert
Anthony E. Rothert
Jessie Steffan
Omri E. Praiss
ACLU OF MISSOURI
  FOUNDATION
906 Olive Street
Suite 1130
St. Louis, MO  63101
(314) 652-3114


Gillian Wilcox
ACLU OF MISSOURI
  FOUNDATION
406 West 34th Street
Suite 420
Kansas City, MO  64111

*Counsel for Plaintiffs-Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 10,992 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

This brief has been scanned for viruses pursuant to Eighth Circuit Local Rule 28A(h)(2) and is virus-free.

/s/ Anthony E. Rothert

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on May 24, 2019, which delivered a copy of the brief to counsel of record. Upon approval papers copies will be sent to the court and counsel of record.

*/s/* Anthony E. Rothert